IN THE UNITED STATES DISTRICT COURT OF TENNESSEE
EASTERN DISTRICT AT KNOXVILLE

ESTATE OF ELIJAH LESTER ISBILL )
By Windy Duncan, Administrator )
       )
       Plaintiff, )
       )
v. )     Docket No. _____
       )     **JURY DEMANDED**
TURNKEY HEALTH CLINICS, LLC )
d/b/a TK HEALTH, DONNA CHISHOLM, )
COURTNEY WOODS, and GREG MILLS )
CITY OF MADISONVILLE, TENNESSEE, and )
OFFICERS CAMERON FOISTER and )
ROBERT DENNY MOORE )
       )
       Defendants. )

## COMPLAINT

Comes the Plaintiff, ESTATE OF ELIJAH LESTER ISBILL, and files this Complaint against the named Defendants and would show the Court as follows:

## I.    INTRODUCTION

1.    As to Defendants, TURN KEY HEALTH CLINICS, LLC d/b/a TK HEALTH, DONNA CHISHOLM, COURTNEY WOODS and GREG MILLS (collectively referred to as the "TK Health Defendants"), this is a civil rights action pursuant to 42 U.S.C. §1983 and arises from the prolonged immobilization of a 74-year-old pretrial arrestee/detainee ( "Lester") in a restraint chair for approximately nine (9) consecutive hours without access to a bathroom, water, or food, despite known medical and mental-health conditions and obvious risk of serious harm. These actions and/or inactions are in violation of Lester's Fourth and Fourteenth (or alternatively Eighth) Amendment rights due to these Defendants' failure to ensure that Lester received constitutionally appropriate medical care, their deliberate indifference to Lester's serious medical needs, their failure to intervene in the use of excessive and unjustifiable force while Lester was an arrestee

and/or detainee at the Monroe County jail on February 6, 2025, which ultimately caused his untimely death.

2.      As to the CITY OF MADISONVILLE, TENNESSEE and OFFICERS CAMERON FOISTER and ROBERT DENNY MOORE (collectively referred to as the "City Defendants"), this is a civil rights action pursuant to 42 U.S.C. § 1983 for violation of Decedent's Fourth and Fourteenth Amendment rights for wrongfully detaining and arresting Lester, and by failing to ensure that Lester received appropriate medical care.

3.      At all times relevant, TK Health Defendants and City Defendants were acting under color of law and under the customs and usages of the State of Tennessee.

4.      Decedent, ELIJAH LESTER ISBILL, ("Lester") was an arrestee and/or pre-trial detainee in the custody of the Defendants and while at the Monroe County Jail which is in Monroe County, Tennessee.

## II.      JURISDICTION & VENUE

5.      Venue is proper pursuant to 28 U.S.C. § 1391, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1983 and 1988.

## III.      PARTIES

6.      Plaintiff, WINDY DUNCAN, Administrator of the ESTATE OF ELIJAH LESTER ISBILL, is the duly appointed Administrator, his daughter and the representative of Decedent's beneficiaries. At all times relevant, Lester was a resident of Monroe County, Tennessee. On or about February 6, 2025, Decedent was arrested at 440 Isbill Road, Madisonville, Tennessee by Madisonville Police Officers Foister and Moore. Officer Foister charged Decedent with disorderly conduct, a C-Misdemeanor, and transported him to the Monroe County Jail. Lester was confined

in a restraint chair in the Monroe County Jail for over nine (9) hours before he died. At the time of his arrest, detention and death, Lester was 74 years old.

7. Defendant, TURNKEY HEALTH CLINICS, LLC d/b/a TK HEALTH (hereinafter referred to as "TK Health"), is a for-profit limited liability company formed in the State of Oklahoma and was qualified to do business in Tennessee on July 29, 2024. Its registered agent for service of process in Tennessee is CT Corporation System, 300 Montvue Road, Knoxville, Knox County, Tennessee 37919. Upon information and belief, its principal executive office and corporate headquarters is located at 900 NW 12th Street, Oklahoma City, Oklahoma. On July 15, 2024, TK HEALTH assumed the Agreement for the Provision of Inmate Health Services for Monroe County Jail. TK Health agreed to provide constitutionally adequate medical and mental health services to detainees in the Monroe County Jail and was responsible for providing appropriately trained and qualified medical support staff at the Monroe County Jail. At all times relevant herein, TK Health was responsible for the policies, personnel decisions and medical services provided at the Monroe County Jail and provided the agents and/or employees, medical services and policies for the Detainees of the Monroe County Jail.

8. Defendant, DONNA CHISHOLM, was, at all times relevant herein, an advanced practice registered nurse practitioner and an agent, servant and/or employee of TK HEALTH. Upon information and belief, CHISOLM had responsibilities to diagnose and treat persons such as Lester and further responsibilities to supervise and see that employees and/or agents of TK HEALTH provided constitutionally appropriate medical care to inmates and detainees such as Lester. It is believed Defendant CHISHOLM can be served with process at 10127 Sea Candles Way, Apt. C201, Knoxville, Tennessee 37932. Defendant CHISHOLM is being sued in her individual capacity.

3

9.     Defendants, COURTNEY WOODS and GREG MILLS, are licensed practical nurses and were, at all times relevant herein, agents, servants and/or employees of TK HEALTH. They had responsibilities to provide constitutionally adequate health care to Lester. It is believed Defendant WOODS can be served with process at 263 Scenic View Road, Madisonville, Tennessee 37354. It is believed Defendant MILLS can be served with process at 725 Eastanaula Road, Sweetwater, Tennessee 37874. These Defendants are sued in their individual capacity.

10.    Defendant, CITY OF MADISONVILLE, TENNESSEE, is a governmental entity organized and existing pursuant to the laws of the State of Tennessee and sued in its official capacity. Defendant City of Madisonville is an entity subject to suit pursuant to 42 U.S.C. § 1983 and may be served with process through its Mayor, Scott Hunt, at 400 College Street N, Madisonville, Tennessee 37354. At all times relevant, the Police Officer Defendants were agents, servants and/or employees of the Defendant City of Madisonville.

11.    Defendants, OFFICERS CAMERON FOISTER and ROBERT DENNY MOORE, were, at all times relevant herein, agents, servants and/or employees of the City of Madisonville, Tennessee Police Department. Defendants Foister and Moore acted under color of law and the customs and usages of the State of Tennessee. These Defendants are sued in their individual capacities only.

12.    Each of the above-listed Defendants, at all times relevant herein, acted under color of law and under the customs and usages of the State of Tennessee.

## IV.    FACTS

13.    Lester Elijah Isbill, born May 19, 1950, was a family man and proud father of two (2) daughters, 11 grandchildren and 10 great grandchildren. He was a lifelong resident of Monroe County, Tennessee, and a man of faith who preached for 36 years at a local church.

4

14.    In 2022, Lester retired from preaching and spent his days working on his farm and spending time with his family.

15.    Due to his age, Lester's health deteriorated, and he required the assistance of a walking stick. Lester had, among other medical issues, diabetes, high blood pressure, mild dementia and mini strokes.

16.    On February 6, 2025, after being confined in a restraint chair for over nine (9) hours with a spit hood over his head, Lester died alone in a jail cell. At the time of his death, Lester was 74 years old.

### Defendants City of Madisonville, Tennessee, Foister and Moore

17.    On February 6, 2025, Lester goes to Security Finance located at 440 Isbill Road, Madisonville, Tennessee in Monroe County to pay his bill as he always did. While in Security Finance, Lester becomes disoriented and confused and is unable to stand. At about 12:20 p.m., a concerned Security Finance employee calls E911 on Lester's behalf.

18.    The Security Finance employee tells E911 that Lester, their "elderly customer," who is 75 years old, has "health issues," and wants someone to come and check Lester.

19.    Soon after, Officers Foister and Moore receive the E911 dispatch concerning Lester, the "elderly man" that is "very confused" and "disoriented" and who may have dementia or other medical issues. About 10 minutes later, Foister and Moore arrive at Security Finance.

20.    When they arrive, Lester is sitting in his car with his door open and he is talking to a couple of people. Foister and Moore walk to Lester's open car door and begin to ask Lester questions to determine his cognitive and mental status.

21.    In response to their questions, Lester's answers are incoherent and he trails off without finishing his confused thought.

22.      Foister asks Lester the day, to which he replies: "its 1948 ain't it." Then Foister

asks Lester who is president, to which he replies: "George Washington." Foister follows by asking

Lester the month, to which he replies: "I don't even know what year it is."

23.      Foister then steps away from Lester's car, contacts dispatch and states Lester is

"very confused and a possible diabetic." Soon after, Foister calls Lester's daughter to request her

to come to Security Finance and get Lester.

24.      At the conclusion of that telephone call, Foister walks back to Lester's car and is

told that Lester is experiencing some type of seizure.

25.      At about 12:45, Lester's blood pressure, heart rate and oxygen levels are checked.

26.      Lester's blood pressure is 218/110 and his pulse rate and oxygen levels are low.

27.      Lester's blood pressure is extremely high, which indicates a hypertensive crisis, a

medical emergency requiring immediate attention.

28.      Blood pressure at this level could cause a stroke or heart attack or cause severe

damage to vital organs, including the heart, brain, kidneys and eyes.

29.      Throughout this encounter, Lester goes in and out of trances and silently stares off

in the middle of conversations with Foister and Moore. During one of Lester's trances, they say,

"that's not normal" and "he's in stroke range" because Lester's blood pressure is "through the roof."

30.      At about 12:57 p.m., although Lester has not violated a law, Foister gives Lester

three (3) options: go to the hospital, go with your daughter, or go to jail. Lester tells Foister and

Moore to leave him alone and let him be.

31.      And at about 1:00 p.m., Foister demands Lester to get out of his car.

32.     When he was taken out of his car, Lester, who is neither under arrest nor has violated a law, requests to go to the bathroom and attempts to walk off. But Moore and Foister stop him. Lester urinates on himself in the parking lot, in front of several people.

33.     At about 1:05 p.m., although it was obvious, the on scene medical personnel tells Foister and Moore that Lester's behavior is a medical issue "because his blood pressure is high."

34.     When Lester's daughter arrives, Foister tells her that Lester's blood pressure is really high and his heart rate is low.

35.     At about 1:08 p.m., Lester continuous to speak unintelligible and again tries to walk off. But Moore will not let Lester walk away and continues to restrain him. Lester again tells Moore and Foister to let him go, to get away from him, and to turn him loose.

36.     Instead, Foister and Moore decide to arrest Lester as soon as he signs the refusal for medical treatment form.

37.     Because Lester is incoherent and is making rambling and disjointed statements, the refusal for medical treatment form is never presented to Lester himself, and Lester never signs the form.

38.     Instead, the refusal for medical treatment form is presented to his daughter, who is required to sign it. Foister and Moore tell Lester's daughter they will make sure Lester receives medical care and treatment. And once Lester's daughter signed the form, Foister and Moore put Lester in handcuffs.

39.     Foister and Moore know that Lester is experiencing a serious medical and mental health episode and they do not have probable cause to detain or arrest him.

7

40.     Throughout their interaction, Lester shows signs of a serious medical emergency; appears visibly distressed, upset and unstable; and speaks incoherently. And Foister and Moore have direct knowledge of Lester's serious and acute medical condition.

41.     Instead of obtaining appropriate medical and mental health care for Lester, at about 1:18 p.m., almost 50 minutes since their arrival at Security Finance, Foister and Moore handcuff Lester, load him in their patrol car and take him to the Monroe County Jail.

42.     Lester is charged with disorderly conduct, a class C Misdemeanor.

43.     Despite knowing Lester's medical condition, after he was arrested, the City Defendants began to falsely allege that Lester was "on something" and state other facts in an attempt to support their reason to arrest. Lester's toxicology is negative for alcohol and drugs.

44.     At about 1:27 p.m., Foister and Moore pull into the Monroe County Jail Salley Port.

45.     Moore says, "maybe [Lester] can get him some help" and "something in [Lester's] brain is not functioning."

46.     At about 1:30 p.m., Foister tells a corrections officer that Lester, an older guy, "is disorderly," "resisted a little bit" and "he's kinda loud and mouthy."

47.     Foister then tells the corrections officer that the dispatch call comes in as Lester "being disoriented" and "EMS couldn't force him to go [to the hospital] because he answered all the questions right" and "he refused to go with [family]." Foister tells the corrections officer then Lester becomes disorderly, "so we loaded him."

48.     Foister says that he wrote on the form that Lester may need "to talk to someone mental wise, EMS or your medical staff." And tells the corrections officer that Lester has been a detainee in the Monroe County Jail before, has a medical problem, and has a balancing problem.

8

49. As Lester is being removed from the patrol car, he sounds scared and frightened, makes incoherent statements, asks unintelligible questions and calls for his dog.

50. Defendants Foister and Moore were dispatched for medical assistance and knew that Lester was experiencing a serious medical and mental health episode, but they detained and arrested Lester unlawfully.

51. Foister and Moore lacked probable cause to believe that Lester had committed disorderly conduct or any other offense.

52. No reasonable officer could conclude that an elderly man experiencing a medical emergency satisfied the elements of that charge.

53. By arresting Lester, Foister and Moore unlawfully seized him in violation of the Fourth Amendment. The arrest was unreasonable, unsupported by probable cause and directly contrary to the purpose of the dispatch call.

54. As a result of the illegal and improper actions of Defendants Foister and Moore, Lester suffered humiliation, embarrassment, physical, mental and emotional injuries and violation of his constitutional rights at a time he required immediate medical intervention.

55. City of Madisonville failed to implement appropriate policies and procedures that would ensure arrestees' access to effective medical evaluations and adequate medical and mental health care would not be undermined.

56. City of Madisonville knew or should know that its officers and employees will come into contact with persons experiencing health issues and severely impaired brain function, and the City failed to implement policies and/or adequate training to guide interactions with those persons such as Lester who are suffering from serious medical issues and severely impaired brain function.

9

57. City of Madisonville failed to properly train and supervise its officers and/or employees in their interactions with persons, such as Lester, experiencing health issues and severely impaired brain function.

58. The actions of the City of Madisonville, in failing to establish appropriate policies and procedures and/or failure to properly train the individual defendants, was in violation of both state and federal guidelines and resulted in a violation of Lester's constitutional rights.

59. The City of Madisonville had a duty and responsibility to establish policies, procedures and practices in compliance with state and federal rules, regulations, laws and constitutional standards regarding the execution and implementation of its officers', agents', servants' and/or employees' interactions with people, such as Lester, who are experiencing serious medical and mental health issues. This Defendant failed to establish such policies, procedures and practices and/or failed to properly and/or inadequately trained its officers, agents, servants and/or employees in these matters, all of which solely or in combination resulted in the violation of Lester's Fourth and Fourteenth Amendment rights.

60. At all times relevant, and upon information and belief, City Defendants either personally observed Lester or knew or should have known of his deteriorating medical condition. As such, they were aware or should have been aware that Lester suffered from an objectively serious medical need. And these Defendants' actions or lack thereof were either intentional, in ignoring Lester's objectively serious medical needs, or reckless in that they failed to act reasonably to mitigate the risk of the objectively serious medical needs posed by Lester. As such, these Defendants were deliberately indifferent to Lester's serious medical needs.

61. Alternatively, City Defendants recognized Lester had an objectively serious medical need and knew or should have known from the facts available to them of Lester's serious

medical need but disregarded the substantial risk the serious medical need posed to Lester by failing to take reasonable actions to abate the risk. As such, these Defendants were deliberately indifferent to Lester's serious medical need.

62.     The actions of Defendants Foister and Moore were intentional, deliberate, reckless, willful, malicious and taken with an intent and/or motive to violate Lester's well established constitutional rights and in reckless disregard of those rights.

63.     The actions and/or inactions of City Defendants was the direct and proximate cause of Lester's clearly established Constitutional rights.

64.     The actions of Defendants Foister and Moore constitute conduct for which an award of punitive damages is appropriate.

**Defendants TK Health, Chisholm, Woods and Mills**

**In Booking Cell BK 13**

65.     TK Health Defendants were familiar with Lester from a prior arrest and detention a few months before at the Monroe County Jail for DUI, which was subsequently dismissed for lack of probable cause, and were aware of or knew of Lester's medical and mental health history. On this occasion, a Medical/Mental Health Screening was completed. The medical questionnaire notes that Lester is prescribed heart, blood pressure and cholesterol medications; he had a recent pacemaker surgery; and he is under the medical care of two (2) doctors. Later, Woods evaluated Lester for a psychological episode and chest pains. Subsequently, Lester was stripped and put into a suicide smock and put in Booking Cell BK10, which is the "padded room" in the Monroe County Jail.

66.     On February 6, 2025, at about 1:38 p.m., after removing Lester from Foister's and Moore's patrol car, corrections officers forcibly carry Lester from the Salley Port and put him into

Booking Cell BK13 by himself. After his belt, shoes, socks, and watch are removed by corrections officers, Lester is left alone in his cell.

67.     About 1:42 p.m., Lester stands up and walks along the toilet partition wall in his cell to his cell door. And as he turns to walk away from his cell door, he falls and hits his head and face against the concrete bench along the back wall.

68.     The bench had no padding or protective covering. Lester is unable to brace himself before impact, and the force of the fall caused visible injury to his face and head. Despite the seriousness of the impact, TK Health Defendants do not provide any medical assistance or assess whether Lester suffered further injury.

### Lester is Put in the Restraint Chair

69.     Instead of receiving medical care or treatment, at about 1:50 p.m., Lester's pants are removed and he is forcibly strapped into a restraint chair, despite exhibiting obvious and dangerous medical distress, while Defendant Woods watches.

70.     As Lester is being strapped in the restraint chair, he is experiencing an acute and dangerous medical condition. About an hour earlier, Lester's blood pressure was measured at 218/110 and he displayed low oxygen levels and an abnormally low pulse rate. These vital signs presented an immediate and substantial risk of serious harm, including stroke, heart attack, respiratory failure, and death, particularly given Lester's advanced age.

71.     While Lester is being strapped into the restraint chair, he is showing signs of a serious medical emergency, and he appears visibly distressed and unstable.

72.     Lester's skin is visibly pale or bluish, and he is talking incoherently and is visibly upset.

73.     Lester's chest, waist, arms and legs are restrained, and he is left immobilized in a seated position.

74.     Before he is restrained, Woods does not perform a medical or mental health evaluation of Lester.

75.     Once restrained, Lester appears unable to comfortably reposition himself, which further restricts normal breathing and circulation.

76.     A decision to place Lester in a medical or mental health unit for emergency involuntary treatment is never made by TK Health Defendants.

77.     Woods does not obtain Lester's blood pressure, oxygen levels or other vitals before he is confined in the restraint chair. And Woods never checks Lester's head from his headfirst fall into the cell's concrete bench.

78.     Lester, in the restraint chair, is put back into cell BK 13 by the corrections officers and Woods. The back of the restraint chair is towards the cell door, where Lester's face and body cannot be observed.

79.     Despite Lester's mental health issues and his high blood pressure, low pulse and low oxygen levels, the appropriate checks on Lester do not occur during the first hour of his restraint chair confinement.

**1 Hour in the Restraint Chair**

80.     At about 2:50 p.m., it has been one (1) hour since Lester was strapped in the restraint chair. He is not taken out of the restraint chair, he is not given water, and he is not allowed to use the bathroom.

81.     Woods knows that Lester is strapped in the restraint chair and has been for one (1) hour.

13

82.     At the end of one (1) hour, Woods does not determine Lester's medical and mental health condition. Woods does not take Lester's vitals or perform any medical assessment. And Woods does not advise whether Lester should be in a medical or mental health unit for emergency involuntary treatment or other medical management.

83.     Despite Lester's mental health issues and his high blood pressure, low pulse and low oxygen levels, the appropriate checks to Lester do not occur.

84.     While restrained, Lester is still visibly and audibly in distress.

85.     Lester's medical and mental health condition is obvious. And Woods does not intervene on Lester's behalf but acquiesce in his continual confinement in the restraint chair.

## 2 Hours in the Restraint Chair

86.     At about 3:50 p.m., after two (2) hours, Lester is not taken out of the restraint chair, he is not given water, and he is not allowed to use the bathroom.

87.     Lester's extremities are obviously discolored.

88.     Lester is visibly distressed and unable to appropriately reposition himself in the restraint chair. Lester's mental and medical condition is serious and obvious.

89.     Further exacerbating his mental health episode and respiratory crisis, a "spit hood" was put over Lester's head and face with Woods' knowledge and consent.

90.     Woods and others laugh as they stand around Lester while he has a spit hood over his head and is strapped in the restraint chair.

91.     Woods knows and/or is aware that Lester has been confined in the restraint chair continuously for two (2) hours.

92.     Despite Lester's obvious distress, after two (2) hours of continuous confinement in the restraint chair, Woods does not check Lester's vitals or assess Lester's medical and mental health condition.

93.     At the end of two (2) hours, Woods does not advise whether Lester should be in a medical or mental health unit for emergency involuntary treatment or other medical management.

94.     The restraint chair manufacture warns that detainees should not be left in the restraint chair for more than two (2) hours.

95.     But, Woods does not intervene on Lester's behalf or provide him with any medical assistance. Instead, Woods acquiesces in Lester's continuous confinement in the restraint chair beyond two (2) hours.

### 3 Hours in the Restraint Chair

96.     At about 4:50 p.m., Lester has been confined in the restraint chair for three (3) hours, now with a spit hood over his head since about 4:00 p.m.

97.     During this hour, despite Lester's obvious medical and mental health issues, the appropriate checks to Lester do not occur. And Lester is not taken out of the restraint chair, is not given water, and is not allowed to use the bathroom.

98.     And during this hour, no one checks Lester's extremities, which are obviously discolored.

99.     Throughout this hour, Lester is audibly upset and in distress.

100.    Still, despite knowing Lester is in the restraint chair for three (3) hours, Woods does assess Lester's medical and mental health condition or advise whether he should be in a medical or mental health until for emergency involuntary treatment or other medical management.

101.    Woods does not check Lester's vitals or perform any medical assessment.

102.    Lester's continuous confinement in the restraint chair is excessive.

103.    Woods does not intervene or attempt to provide or obtain medical assistance for Lester's serious medical needs but again acquiesce in Lester's continuous confinement to the restraint chair with a spit hood over his head.

104.    During this hour, Lester is suffering from an obvious and serious medical condition and mental health episode. Woods is aware of and/or knows of Lester's serious medical and mental health condition and continues to ignore and/or disregard it.

### 4 Hours in the Restraint Chair

105.    At about 5:40 p.m., Lester has been continuously confined to the restraint chair four (4) hours. He still has a spit hood over his head.

106.    After four (4) hours, being confined in a seated, Lester is not taken out of the restraint chair.

107.    After four (4) hours, Lester is still not given water.

108.    After four (4) hours, Lester is still not allowed to use the bathroom.

109.    Lester's extremities are discolored.

110.    At the end of four (4) hours, Woods does not assess Lester's medical and mental health condition and does not advise whether Lester should be in a medical or mental health unit for emergency involuntary treatment or other medical management. But again, instead of intervening, Woods acquiesces in Lester's continuous confinement in the restraint chair.

111.    Throughout Woods' shift, Lester writhes and jerks in the restraint chair and speaks incoherently.

112.    At 6:00 p.m., Woods' shift is over, and Defendant Mills' shift begins. But Lester is left in the restraint chair with the spit hood over his head. When Mills' shift begins, he knows

and/or is aware that Lester has been continually confined to the restraint chair for more than four (4) hours.

113. Mills does not complete an assessment of Lester's medical and mental health despite knowing that it was never done.

114. Lester's mental health and medical health condition is obvious and serious.

115. While restrained, Lester is experiencing serious and worsening medical distress.

116. Throughout the four (4) hour restraint, Lester repeatedly yells and continuously moves against the restraints.

117. Lester's movements are not aggression; it is desperation.

118. Throughout the four (4) hour restraint, Lester shifts, twists, and struggles in the chair in a visible attempt to breathe, relieve pain, regain circulation or draw attention to his worsening condition.

119. The restraints prevent meaningful movement, leaving Lester trapped in mounting discomfort and panic.

120. Denied water, Lester becomes increasingly dehydrated.

121. Denied a bathroom break, Lester is forced to endure physical humiliation and additional stress.

122. These deprivations compound the medical crisis, intensifying strain on the heart and lungs, while the restraint chair prevents normal breathing, circulation and self-regulation.

123. Still, despite hours of clear distress, repeated vocalization, and continuous physical agitation, TK Defendants do not intervene on Lester's behalf.

124. Lester endures extreme physical pain, mounting fear, and emotional terror as his body continues to fail while he is unable to protect himself, seek relief, or escape the restraints.

125.     Lester's continuous confinement in the restraint chair is excessive. But TK Health Defendants decide and/or acquiesce in Lester remaining in the restraint chair beyond four (4) hours.

### 5 Hours in the Restraint Chair

126.     At 6:50 p.m., Lester is still confined to the restraint chair, now for five (5) hours. And, after five (5) hours, he is not taken out of the restraint chair, he is not given water, and he is not allowed to use the bathroom.

127.     The appropriate check of Lester is not performed, and Lester's extremities are obviously blue in color.

128.     Mills does not check Lester's vitals or perform any medical assessments.

129.     At the end of five (5) hours, despite the obviousness of Lester's condition, Mills does not assess Lester's medical and mental health condition and does not advise whether Lester should be in a medical or mental health unit for emergency involuntary treatment or other medical management.

130.     Instead of intervening and getting Lester medical assistance, TK Health Defendants acquiesce in Lester's continuous, excessive confinement in the restraint chair.

### 6 Hours in the Restraint Chair

131.     After six (6) hours of confinement, Lester is still not taken out of the restraint chair, is not given water, and is not allowed to use the bathroom.

132.     No one even checks on Lester for over two (2) hours.

133.     During this time, Lester's medical condition is critical.

134.     Mills does not take Lester's vitals or perform a medical or mental health assessment or advise whether Lester should be in a medical or mental health unit for emergency involuntary treatment or other medical management.

135. Mills never intervenes on Lester's behalf and allows his continual confinement in the restraint chair.

## 7 hours in the Restraint Chair

136. At 8:50 p.m., Lester is still strapped in the restraint chair. It has now been seven (7) hours. And, after seven (7) hours, he is still not taken out of the restraint chair and is not given water or allowed to use the bathroom.

137. It is noted that Lester is speaking incoherently. Lester is in obvious distress.

138. Mills does not assess Lester's medical and mental health condition or check Lester's vitals.

139. TK Health Defendants still do not intervene to remove Lester from the restraint chair.

140. And Lester is kept in the restraint chair for another hour.

## 8 Hours in the Restraint Chair

141. At 9:50 p.m., which is eight (8) hours of continuous confinement, Mills does not take Lester's vitals or perform a medical and mental health assessment, and no one does the appropriate checks on Lester.

142. Eight (8) hours later, Lester has still not been taken out of the chair, drank any water or been allowed to use the bathroom.

143. Lester is speaks incoherently and continues to struggle against the restraints and vocalize his distress and panic.

144. And Lester is held in the restraint chair for another hour.

## 9 Hours in the Restraint Chair

145.    Nine (9) hours later, at 10:50 p.m., Lester remains strapped in a seated position in the restraint chair and does not receive water, medication, sustenance or a bathroom break.

146.    Despite being in the restraint chair for nine (9) hours, TK Health Defendants do not perform a medical or mental health assessment on Lester.

147.    TK Health Defendants know and/or are aware that Lester, the whole time he's been in the restraint chair, has struggled in his chair, continuously shouted, and made incoherent statements.

148.    Throughout Mills' shift, he never obtains Lester's vitals. But Mills falsely reports that he checked them.

149.    Around 11:00 p.m., over nine (9) hours later, Lester, while still in the restraint chair, stops breathing and dies.

150.    During Lester's restraint, his chest, waist, arms, and legs were restrained.

151.    He was immobilized in a seated position for over nine (9) hours.

152.    Lester was unable to stand, lie down, reposition himself or relieve pressure on his body.

153.    During his entire nine (9) hour restraint, TK Health Defendants provided Lester with no medical evaluation, medication or no treatment of any kind.

154.    TK Health Defendants denied Lester all access to drinking water, food and bathroom facilities during the nine (9) hour restraint period.

155.    While restrained, Lester repeatedly yelled out, spoke incoherently, and continuously moved against the restraints.

156. Lester's behavior was persistent, auditory and visible throughout the restraint period.

157. Lester's yelling, confusion, and constant movement reflected panic, disorientation, pain and an attempt to breathe, relieve discomfort, restore circulation, or signal that his condition was worsening.

158. TK Health Defendants observed or were in close proximity to Lester during this period and were aware of his age, his restraint status, his abnormal vital signs, and his ongoing physical and mental distress.

159. Lester's medical crisis and distress were open and obvious. No reasonable medical professional could fail to recognize that confining a 74-year-old man with dangerously high blood pressure, low oxygen levels, and a low pulse in a restraint chair without water, food, medication, bathroom access or appropriate monitoring for over 9 hours created a substantial risk of serious harm.

160. Despite knowing of this risk, TK Health Defendants failed to intervene, failed to provide medical care, failed to terminate the restraint, and failed to transfer Lester for emergency evaluation.

161. TK Health Defendants failure to act was not accidental, inadvertent, or the result of mere negligence. It was a conscious decision to disregard a known and escalating danger to Lester's health and safety.

162. The prolonged restraint caused Lester severe physical pain, which worsened as hours passed without relief.

163. The denial of water caused dehydration, intensified stress on Lester's heart and circulatory system, and increased his risk of stroke or cardiac failure.

164. The denial of bathroom access subjected Lester to humiliation, distress, and loss of dignity while he remained powerless and restrained.

165. Lester experienced escalating panic and emotional terror as he remained restrained, confused, thirsty, and untreated, unable to understand why no one was helping him or how long the restraint would continue.

166. TK Health Defendants' conduct served no legitimate medial, safety or correctional purpose and was grossly disproportionate to the circumstances presented.

167. An autopsy was conducted and the pathologist notes that "[t]here were [] areas of strokes in the brain."

168. The "[t]oxicology was negative for alcohol and drugs . . . ."

169. The pathologist states that dehydration was a contributing factor in Lester's death, along with Lester's prolonged restraint in a restraint chair. And the pathologist concludes that Lester's cause of death is hypertensive and atherosclerotic cardiovascular disease complicated by dehydration and restraint.

170. Lester's manner of death is ruled a homicide.

171. For over nine (9) hours, Lester is continuously confined in a seated position in the restraint chair, is never given any water and is never allowed to use the bathroom.

172. In over nine (9) hours, Lester's medical and mental health condition is not assessed, and a determination is never made by TK Health Defendants to put Lester in a medical or mental health unit for emergency involuntary treatment or other medical management, despite knowing Lester's obvious serious medical and mental health needs.

173. TK Health Defendants do not provide Lester any medication or other medical assistance, despite knowing and/or being aware of Lester's medical history.

174. TK Health Defendants never intervene on Lester's behalf but acquiesce in his continuous confinement, despite knowing of his serious medical and mental health needs.

175. TK Health Defendants are aware of and disregard Lester's serious medical needs and fail to obtain the appropriate medical assistance.

176. TK Health Defendants' actions and/or inactions demonstrate a wanton disregard for the life and safety of Lester.

177. Despite knowing of Lester's medical condition, TK Health Defendants falsely allege that Lester was "on something" and did not provide or obtain the appropriate medical assistance for him.

178. TK Health Defendants, as medical providers, have the ability to require that Lester be removed from the restraint chair for medical treatment and/or medical reasons, but fail, refuse and/or neglect to do so.

179. TK Health Defendants fail to check Lester's circulation in his extremities, which were obviously discolored, and fail to report Lester's medical and mental health problems.

180. TK Health Defendants fail to properly examine Lester or conduct a medical and mental health assessment and review his medical record to identify any pre-existing medical condition(s) that might affect the use of the restraint chair.

181. TK Health Defendants fail to review Lester's medical record for any medical condition(s) that may affect the use of the restraint chair prior to its use.

182. TK Health Defendants observe and/or know of the ongoing unconstitutional restraint and denial of Lester's basic needs and have a realistic opportunity to intervene to prevent or mitigate the harm, but fail to do so.

183. Lester is entitled to timely and adequate medical and mental-health care and his nine (9) hour restraint with denial of bathroom, water and food, and without assessment or proper monitoring, amid obvious vulnerability of a 74-year-old with medical and mental health issues, demonstrates deliberate indifference and objective unreasonableness.

184. Lester's prolonged immobilization of over nine (9) hours with no bathroom break or water is excessive, objectively unreasonable, and punitive.

185. TK Health Defendants' actions and/or inactions was the direct and proximate cause of Lester's death.

186. TK Health failed to supervise, train and/or establish policies and procedures for the medical and mental health of detainees, such as Lester, who are placed in restraint chairs concerning the appropriate assessment to be completed and to advise whether to admit the detainee to a medical/mental health unit for emergency involuntary treatment and/or other medical management.

187. TK Health failed to supervise, train and/or establish and enforce procedures for the medical and mental health of detainees, such as Lester, to determine whether the detainee should be placed and/or remain in restraint chairs for prolonged periods of time.

188. TK Health failed to supervise, train and/or establish policies and procedures for the safety of detainees who are placed in restraint chairs concerning the appropriate number of breaks to give a detainee in a restraint chair.

189. TK Health failed to supervise, train and/or establish policies and procedures for the safety of detainees of how to monitor those who are placed in a restraint chair.

190. TK Health failed to supervise, train and/or establish policies and procedures for the safety of detainees who are placed in restraint chairs in the Monroe County Jail.

191. TK Health Defendants failed to intervene on Lester's behalf and demand that he be released from the restraint chair, that he receive a medical and mental health assessment, and/or that he be transferred to the hospital for involuntary commitment or other medical management.

192. TK Health Defendants failed to intervene to ensure Lester received proper health care and not be subjected to excessive force.

193. TK Health affirmatively approved Defendants Woods' and Mills' actions and/or inactions by publicly failing to take remedial actions.

194. TK Health's policy, practice and/or custom did not require a determination of whether the detainee should be in a medical/mental health unit for emergency involuntary treatment with sedation and/or other medical management, as appropriate.

195. TK Health's policy, practice and/or custom for the use and implementation of restraint chairs does not require medical clearance and/or approval be obtained before placing a person in the restraint chair.

196. At all times relevant, the policy, practice and/or custom of TK Health is to allow and/or encourage its Jail medical personnel to exceed the scope of their statutorily permitted practice; for its licensed practical nurses to make medical diagnoses and medical decisions concerning detainees and inmates; and/or to provide inadequate training and supervision to its medical personnel.

197. That as it relates to the use of the restraint chair and providing medical services, Defendant TK Health established a policy, custom, practice and procedure of:

      a. Not performing examinations of inmates or detainees before placing them in the restraint chair;

b. Not conducting circulation checks every fifteen minutes or hourly, while an inmate or detainee was confined to the restraint chair;

c. Not ensuring the inmate or detainee received food or hydration every 60 minutes or as needed;

d. Not ensuring the inmate or detainee was allowed breaks or released every 60 minutes and allowed to use the restroom;

e. Not performing examinations to make sure the inmate or detainee was physically fit to remain in the restraint chair;

f. Not providing or withholding medicine from a detainee; and

g. Not providing or withholding proper medical care guaranteed to detainees under federal and state law, including the United States Constitution.

198. TK Health inadequately supervises and/or trains its nurses, medical staff and/or employees with respect to the use of restraint chairs on detainees with medical and mental health issues.

199. TK Health inadequately supervises and/or trains its nurses, medical staff and/or employees with respect to the use of restraint chairs on detainees who are elderly and have physical handicaps and medical issues.

200. TK Health inadequately supervises and/or trains its nurses, medical staff and/or employees with respect to use of restraint chairs for unnecessarily prolonged periods of time on detainees who are elderly and have physical handicaps and medical issues.

201. TK Health has the duty and obligation to properly train and supervise its medical employees, such as Defendants Chisholm, Woods and Mills, with respect to detainee/inmate

oversight and medical care. TK Health failed to ensure that its medical personnel at the Monroe County Jail were adequately trained and/or supervised in the provision of inmate medical care.

202.     As a result of TK Health's express policy, practice and/or custom there was no properly trained and supervised medical employee present during the time of Lester's detention to properly diagnose and treat Lester.

203.     As a result of the policies, practices and/or customs established by TK HEALTH, including but not limited to its failure to provide adequate training and supervision related to inmate medical care, as set out above, Lester suffered physical, mental, and emotional injury that ultimately resulted in his death, all in violation of his 4th and/or 14th Amendment rights.

204.     At all times relevant, and upon information and belief, Defendants TK HEALTH, WOODS, MILLS, and CHISHOLM had either personally observed Lester or knew or should have known of his deteriorating medical condition and his continuous confinement in the restraint chair. As such, they were aware or should have been aware that Lester suffered from an objectively serious medical need. And these Defendants' actions or lack thereof were either intentional, in ignoring Lester's objectively serious medical needs, or reckless, in that they failed to act reasonably to mitigate the risk of the objectively serious medical needs posed by Lester. As such, these Defendants were deliberately indifferent to Lester's serious medical needs.

205.     Alternatively, TK Health Defendants recognized Lester had an objectively serious medical need and knew or should have known from the facts available to them of Lester's serious medical need, but disregarded the substantial risk the serious medical need posed to Lester by failing to take reasonable actions to abate the risk. As such, these Defendants were deliberately indifferent to Lester's serious medical need.

206. TK Health, at all times relevant, established the policies, practices, customs and usages for the provision of health and medical care to inmates and detainees such as Lester. As such, TK Health was responsible for employing, training and supervising personnel who would and could appropriately diagnose and treat inmates and detainees at the Monroe County Jail who suffered from serious medical needs such as Lester. In these regards this Defendant was deliberately indifferent to Lester's serious medical needs.

207. Defendant CHISHOLM, at all times relevant, was responsible for appropriately diagnosing and treating detainees at the Monroe County Jail. Upon information and belief, CHISHOLM was an advanced practice registered nurse practitioner for the jail and was responsible for making medical decisions regarding Lester's medical care and treatment and supervise the medical personnel at the Monroe County Jail. Additionally, and/or alternatively, CHISHOLM failed to properly supervise and/or correct the Defendants Woods and Mills, as to their constitutionally appropriate conduct regarding the prolonged restraint and recognition of serious medical and mental health needs of detainees such as Lester and the provision of health care to inmates and detainees with serious medical and mental health needs, and as such were deliberately indifferent to Decedent's serious medical need.

208. Defendants, DONNA CHISHOLM, COURTNEY WOODS and GREG MILLS personally participated in ordering, maintaining, and/or monitoring the prolonged restraint of Lester and the denial of his basic human needs. And their employer, TK Health, acted under color of law and maintained policies, customs, and/or failure to train and/or supervise that were the moving force behind these violations.

209.    The actions and failures to act, as to all Defendants and as set out above, solely and/or in combination were the proximate cause of the damages suffered by Decedent, to include economic damage, pain, suffering, mental and emotional distress and ultimate death of Decedent.

210.    The actions and/or inactions of the Defendants, with the exception of Defendant City of Madisonville, Tennessee, were such as to render them liable for punitive damages.

## V.    CAUSES OF ACTION

211.    The actions and/or inactions of Defendants CITY OF MADISONVILLE and OFFICERS FOISTER and MOORE, solely and/or in combination as set out above violated the rights of Lester under the Fourth and/or Fourteenth Amendment to the United States Constitution.

212.    The actions and/or inactions of Defendants TK HEALTH, CHISHOLM, WOODS and MILLS solely and/or in combination violated the rights of Decedent under the Fourth and/or Fourteenth (and/or alternatively under the Eighth) Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 in that they demonstrate these Defendants used excessive and unnecessary force and were deliberately indifferent to Lester's serious medical needs.

## VI.    RELIEF REQUESTED

213.    Plaintiff requests the following relief:

a.    Award Plaintiff compensatory damages;

b.    Award Plaintiff punitive damages against the individual Defendants;

c.    Award Plaintiff's attorneys their attorney's fees and costs pursuant to 42 U.S.C. § 1988 and/or 42 U.S.C. §12205; and

d.    Award Plaintiff such other and further relief to which he may be entitled;

e.    **EMPANEL A JURY TO TRY THIS MATTER**.

Respectfully submitted.

WORTHINGTON & WEISS, P.C.

s/W. Tyler Weiss
W. TYLER WEISS [BPR No. 028801]
409 N. College Street, Suite 1
Madisonville, Tennessee 37354
Office: (423) 442-5353
Fax:    (423) 442-3866
Email: tweiss@worthingtonweiss.com
*Counsel for Plaintiff*